USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/11/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
MARK COLLINS,                           :
                                        :            PRO SE
                    Petitioner,         :
                                        : 07 Civ. 9463 (BSJ)(THK)
                                        :
         -against-                      :
                                        : **REPORT AND RECOMMENDATION**
DALE ARTUS,                             :
                                        :
                    Respondent.         :
----------------------------------------X
**TO: HON. BARBARA S. JONES, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

Petitioner Mark Collins brings this action for a writ of
habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his
February 8, 2003 conviction in the New York State Supreme Court,
New York County, after a jury trial, of two counts of Arson in the
Second Degree (N.Y. Penal Law § 150.15), two counts of Conspiracy
in the Fourth Degree (N.Y. Penal Law § 105.10(1)), one count of
Burglary in the First Degree (N.Y. Penal Law § 140.30(3)), and one
count of Tampering with Physical Evidence (N.Y. Penal Law §
215.40(2)). Petitioner was sentenced to an aggregate indeterminate
term of from twenty-six and two-thirds to thirty-two years in
prison, and five years of post-release supervision. In a decision
dated May 18, 2006, the Appellate Division, First Department
affirmed Petitioner's conviction. See People v. Collins, 29 A.D.3d
434, 815 N.Y.S.2d 80 (1st Dep't 2006), appeal denied, 7 N.Y. 3d 811
(2006).

Petitioner raises four claims in his Petition: (1) the trial

1

court violated Petitioner's right to be present at all material stages of his trial; (2) the sentence Petitioner received is unduly harsh and severe and violates the principle of proportionality; (3) Petitioner was denied effective assistance of counsel; and (4) the trial court erred by permitting the prosecution to introduce evidence of uncharged crimes.   (See Petition for Writ of Habeas Corpus, dated Oct. 10, 2007 ("Pet."); Brief for Defendant-Appellant to the Appellate Division, First Department, dated Oct. 4, 2007 ("Pet.'s App. Br.") at 3.)

The Petition was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York.   For the reasons that follow, the Court respectfully recommends that the Petition be denied and Petitioner's claims be dismissed with prejudice.

**BACKGROUND**

## I. The Trial

The following facts were adduced at Petitioner's trial.

### A. Evidence Supporting Petitioner's Convictions

In January 2001, Craig Cobb began dating Petitioner.   (See Trial Tr. vol. 2, dated Jan. 10, 2003 ("Tr."), at 12-14.)   On April 7, 2001, Petitioner went to Cobb's apartment at 138 West 133rd Street in Manhattan.   (See id. at 12, 25-26.)   Petitioner spent the night and most of the following day there.   (See id. at 25-26, 29.)

2

On April 8, Cobb went to church and left Petitioner alone in the apartment for about two hours. (See id. at 27-28, 31.)  Cobb kept a spare set of keys hanging from a clock in the kitchen. (See id. at 41.)  During the evening of April 8, Cobb informed Petitioner that the bureau in the apartment contained many "family heirlooms." (Id. at 29-30.)  On the morning of April 9, Petitioner and Cobb left together at about 9:00 a.m.  (See id. at 31.)  Petitioner did not have keys to Cobb's apartment and Cobb did not give Petitioner permission to return to the apartment that day.  (See id. at 27, 31.)

On April 9, at about 1:30 p.m., approximately forty firefighters responded to a fire in Cobb's apartment.  (See id. at 221.)  The fire took about an hour to extinguish and residents of the building were evacuated.  Firefighters broke open both the front door and the bedroom windows in order to "ventilate" the area.  (See id. at 221-34, 388-89.)

Fire Marshal Robert Pinto arrived to investigate what was deemed a "suspicious" fire.  (See id. at 246-47.)  Pinto determined that there had been "three separate" and "nonjoining" fires in the apartment.  (Id. at 256, 263.)  Pinto found that a bureau in the living room had been burned. A linen closet had also been burned. (See id. at 252-53, 256.)  Smoke damage indicated that the blaze started in the middle of a shelf where there was "[n]othing electrical" and "[n]othing that would have caused" a fire.  (Id. at

3

257-59.)  The bedroom had been "gutted" by fire.  (See id. at 259-62.)   Pinto  concluded  from  the  smoke  damage  that  the  fire  had started in the bed itself, away from "any electrical . . . devices and combustible material."  (Id.)  Pinto was able to eliminate all potential accidental causes for each fire.  (See id. at 254, 258-59, 262, 390-95.)

Cobb returned home from work at about 6:30 p.m. that night. In addition to the fire damage, he discovered that a jewelry box that had been on the nightstand in his bedroom was missing.  (See id. at 45-46.)  Earlier in the day, at about 1:00 p.m., Petitioner had telephoned his friend Benny Moultrie and told him, "I did something  wrong."   (Id.  at  147-48,  184.)   Moultrie  persuaded Petitioner to come to his apartment.  (See id.)  Petitioner said that he had taken a spare set of keys from Cobb's kitchen, and used them to get into the apartment.  (See id. at 151.)  Petitioner then gave Moultrie a jewelry box, claiming that it belonged to him, and asked Moultrie to hold onto it.  (See id. at 148-50, 179, 185, 187.)

In late May or early June, Petitioner began a relationship with Carell Kent.  (See id. at 409-10, 468.)  In the second or third week of June, Petitioner asked Kent if he would be willing to "beat up" Cobb.  (See id. at 414-15.)  Kent said that he was not willing.  (See id.)  Petitioner told Kent that "he wanted [Cobb] to be beaten up and battery acid thrown in his face."  (Id. at 416.)

4

Kent contacted two "associates," "Pogo" and "ATL," and agreed to pay them $300 "for beating up and throwing battery acid in the face" of Cobb.  (Id. at 416-18, 462-63, 470.)

On the evening of June 24, Kent went to Petitioner's apartment.  (See id. at 420-21.)  Petitioner took a plastic bag from the closet and removed a "Ragu jar" and "Drano" bottle, which he said contained battery acid and lye.  (See id.)  On June 25th, at about 12:00 p.m., Kent accompanied Petitioner as he rented a car.  (See id. at 402-05, 419-23.)  Petitioner put the battery acid and lye in the trunk of the car and the men drove to Cobb's office on Seventh Avenue in Manhattan.  (See id. at 423-26.)  Between 1:30 p.m. and 2:00 p.m., Petitioner pointed out Cobb standing on the street.  (See id.)  Petitioner said that he wanted to "get" Cobb. (See id.)  Petitioner and Kent drove to 41st Street and Ninth Avenue.  They picked up Pogo and ATL and drove back to Cobb's office.  (See id.)  Petitioner told Pogo and ATL that he "wanted [Cobb] beat[en] up and wanted to have the battery acid and lye thrown in his face."  (Id. at 427-30.)  The men waited in the vicinity for Cobb, but Cobb left work early that day.  When the men did not see Cobb come out of the building, they left the area. (See id. at 429-31, 470-71.)  Before separating, Petitioner gave Pogo and ATL fifty dollars and made plans to meet them the next day.  (See id.)

5

On July 31, Petitioner's neighbor, Michael Monsegur, allowed fire investigators to install a surveillance system in his apartment with a pinhole video camera trained on Petitioner's doorway across the hall. (See id. at 326-27.) As far as can be discerned from the record, the tape, which was played for the jury (See id. at 638), shows Petitioner lighting a fire in front of his door on the morning of August 1. Petitioner ignited two doormats in the hallway, retreated into his apartment, and then twice stepped out to stoke the flames higher. (See Sentencing Hearing Transcript, dated Feb. 6, 2003 ("S."), at 11.) Petitioner's neighbor, Miguel Monsegur, heard a fire alarm sounding in the hallway and saw "smoke and fire" in front of Petitioner's door. (See Tr. at 599-600.) Monsegur extinguished the fire. Fire Marshal Pinto later went to the building and noted "fire damage" to the door and jamb of Petitioner's apartment and "charring" on the floor outside. (See id. at 351-55.)

On the morning of the fire, when firefighters arrived at Petitioner's apartment building, Monsegur told them about the surveillance system. (See id. at 602.) While Monsegur was talking to the firefighters, Petitioner came out of his apartment and said that he had locked himself out, and asked to use Monsegur's telephone to call a friend with spare keys. (See id.) Inside Monsegur's apartment, Monsegur observed Petitioner "trying to touch the VCR" containing the tape from the hallway camera. (See id. at

6

602.)  While Petitioner was waiting for his friend, Monsegur took a shower.  (See id. at 603.)  Afterwards, Monsegur said he had to leave and asked Petitioner to leave.  (See id. at 603-04.) Petitioner shuffled "sideways" out the door, and Monsegur could not see the left side of his body.  (See id.)

Sergeant Biggers and Detective Nichols were among the officers who responded to the fire in Petitioner's building that morning. When Biggers and Nichols went to Monsegur's apartment, they found that the videotape was missing from the recorder attached to the surveillance camera.  (See id. at 562-64, 606, 615.)  The officers obtained, then executed, a warrant to search Petitioner's apartment. (See id. at 568-71, 580-81, 615-16.)  Detective Nichols recovered the missing surveillance videotape from Petitioner's bedroom.  (See id. at 587-88, 616-17.)  A portion of the videotape had been pulled from the cassette casing and the tape was snapped.  (See id. at 616-17, 635-37.)  Nichols took the tape to the District Attorney's Office, where he was able to splice the tape together.  (See id. at 618-19.)  Also recovered from Petitioner's apartment were two canisters of lighter fluid, one of which was completely empty and the other partly empty, two matchbooks, and a lighter.  (See id. at 581-88.)

At about 5:45 p.m., Fire Marshall Pinto and Detective Rolland Gray met with Petitioner.  (See id. at 330-31, 334-39, 360-62, 537-42, 544-47.)  Petitioner was neither handcuffed nor placed under

7

formal arrest.  Nonetheless, Pinto read Petitioner his <u>Miranda</u> rights.  Petitioner waived his rights orally and by a signed written form, agreed to speak to Pinto, and wrote out a statement.  (<u>See</u> <u>id.</u> at 338-40, 346-47.)  As described further below, Petitioner had previously met with Pinto to discuss his allegation that it was Cobb who set the fires.  Petitioner wrote that he had become "very depressed" and "dissatisfied" with the investigation after his first meeting with Pinto.  (<u>Id.</u> at 347-48.)  Petitioner claimed that Pinto had indicated that "perhaps one more fire needs to happen" for Cobb to be held responsible.  (<u>Id.</u>)  Thus, Petitioner "bought some lighter fuel" and, at about 4:30 a.m., set fire to doormats in his building, "hoping this would help."  (<u>Id.</u>)  Petitioner then signed his statement, as did Fire Marshal Pinto and Detective Gray.  (<u>See</u> <u>id.</u>)

Later that night, Moultrie went to the District Attorney's Office and told Fire Marshal Pinto and Detective Malloy that on April 9 Petitioner had confessed to setting fire to Cobb's apartment.  (<u>See</u> <u>id.</u> at 178, 186-88, 357, 518.)  Detective Gray then accompanied Moultrie to his apartment.  Moultrie turned over the jewelry box Petitioner had given him.  (<u>See</u> <u>id.</u>)  Cobb later identified the jewelry box as the one from his apartment.  (<u>See</u> <u>id.</u> at 110-12, 178-79, 518-19, 542-43.)

8

B. Evidence of Uncharged Crimes

During the trial, the prosecutor was permitted to introduce evidence of the following events, which did not form the basis for the charges against Petitioner.

On the morning of April 7, 2001, following an argument with Petitioner the previous evening, Cobb found "black soot covering the interior" of the car and a "basketball" size burn mark on the floor. (Id. at 24, 118-19.)  On April 10, Fire Marshal Pinto inspected the car.   The car did not appear to have been broken into.  Pinto concluded that the car fire was "nonaccidental" and "consistent with an ignitable liquid being spread on the floor" and lit.  (Id. at 49-50, 267-69, 287.)

On June 18 and 19, 2001, Petitioner spoke with Pinto. Petitioner claimed that Cobb had set the fire to receive financial assistance from the city.   (See id. at 271, 278, 280, 309.) Petitioner told Pinto that Cobb admitted to setting the April 9 fire in his apartment.  (See id. at 269-77, 285.)  Petitioner filed a complaint with the police alleging that Cobb had been threatening him.  (See id.)

On June 19, Detective Laurie Malloy spoke to Petitioner.  (See id. at 484-87, 509.)  On June 21st, Malloy arrested Cobb at his job. (See id. at 12-14, 94, 488-92.)  Cobb was released the following day, June 22, and an order of protection was issued against him. (See id. at 96.)

9

Between July 9 and 16, Petitioner made numerous complaints to the police that he was continuing to receive telephone calls from an unidentified man telling him to leave Cobb alone and that he was going to "get" Petitioner. (See id. at 500-02, 515-19, 528-31.) Petitioner, however, had no recordings of these calls. (See id.)

On July 14, at about 1:00 p.m., several doormats "in the vicinity of Petitioner's apartment" were set on fire. (Id. at 290-91, 301, 309-10.)   The fire was extinguished by Petitioner's neighbor Monsegur. (See id. at 596-97.)   Pinto later determined that the doormats had been doused with an "ignitable liquid" and set on fire. (See id. at 290-91, 301, 309-10.)

On July 16, Malloy told Petitioner that she had spoken to an Assistant District Attorney and that she was not going to arrest Cobb again since it could not be demonstrated that he had made or instigated the calls. (See id. at 501-05, 513, 517-18, 525-30.)

On July 18, Moultrie was at his apartment on 412 West 145th Street when he heard his landlord hollering, "Fire." (See id. at 140, 168-71.)   Moultrie opened his door and "smoke gushed in" because the doormat had been burned. (See id.)   Although Moultrie was able to extinguish most of the fire, firefighters had to spray inside the smoldering walls. (See id.)

On the morning of July 25, 2001, Petitioner telephoned Pinto to report another fire in his apartment building. (See id. at 312-13.)   Pinto went to the building and found that the doormat of the

10

apartment adjacent to Petitioner's had been doused in a flammable liquid and set on fire.  (See id.)  On July 30, Pinto responded to a report of a fire in front of Apartment 21, on the second floor of Petitioner's apartment building.  (See id. at 321.)  Another doormat had been doused in a flammable liquid and set on fire.  (See id.)

On July 31, Petitioner went to Pinto's office.  Petitioner blamed Cobb for the fires in his building and the one in Moultrie's building.  (See id. at 327-29.)  Pinto told Petitioner that only the July 14 fire appeared "directly target[ed]" at Petitioner and that there was no evidence linking Cobb to any of the fires.  (See id. at 329-30.)  Petitioner grew "withdrawn and unhappy" with Pinto's response.  (Id.)

C.   Defendant's Case

Petitioner testified at trial that he did not set the April 9th fire in Cobb's apartment.   (See id. at 663, 689, 719-20.) Petitioner claimed that he did not steal Cobb's jewelry box from the apartment.  (See id.)  Petitioner also claimed that he did not set the July 14th and 30th fires in his apartment building, or the July 18th fire in Moultrie's building.  (See id. at 678.)  Petitioner claimed he never asked Kent to have Cobb harmed, never provided battery acid to Pogo and ATL, and never even spoke with those men. (See id. at 667, 671-72, 724.)  Petitioner also claimed that he did not steal the surveillance video from Monsegur's apartment.  (See id. at 739-40.)

D. Verdict and Sentence

On the morning of January 17, 2003, Petitioner addressed the court regarding a statement made by the prosecution during closing statements. (See id. at 884.)  The court then recessed for jury deliberations and Petitioner left to return to the holding cells in the courthouse. (See id. at 906.)  After the recess, the court informed Petitioner's counsel that Petitioner said he was "not feeling well and doesn't wish to come down to attend court." (Id.) The court asked counsel if he would like time to speak with Petitioner. (See id.)  Counsel spoke with Petitioner and advised him of his right to be present, but Petitioner declined to come back to court. (See id.)  The jury informed the court that it had reached a verdict, and subsequently convicted Petitioner on all counts. (See id. at 907-09.)

On February 8, 2003, Justice Ambrecht sentenced Petitioner to concurrent, determinate prison terms of twelve years for the arson conviction and five years for the burglary conviction arising from the April 9, 2001 fire.  The court imposed two indeterminate prison terms of from one and one-third to four years for the conspiracy convictions, which were to run concurrently with each other and consecutively to Petitioner's other sentences.  Finally, the court imposed a determinate prison sentence of twelve years for the arson conviction and an indeterminate sentence of from one and one-third to four years' imprisonment for the evidence tampering arising from

12

the events of August 1, 2001.  (<u>See</u> S. at 30-33.)  These sentences were to run consecutively both with the other sentences and with each other.  In summary, Petitioner received an aggregate sentence of twenty-six and two-thirds to thirty-two years' imprisonment, which was deemed a determinate prison sentence of thirty years by operation of law.  <u>See</u> N.Y. Penal Law § 70.30(1)(e)(iii)(A) (McKinney 1998).  The court also imposed five years of post-release supervision.  (<u>See</u> <u>id.</u> at 33.)

## II. Direct Appeal

On September 30, 2005, Petitioner's assigned appellate counsel, Daniel W. E. Holt, Esq., of the Office of the Appellate Defender, filed a brief on Petitioner's behalf claiming that: (1) the trial court violated Petitioner's right to be present at all material stages of trial by permitting the jury to render a verdict in Petitioner's absence; (2) the trial court erred in admitting evidence of uncharged crimes; (3) the trial court erred in not instructing the jury to consider the lesser included offense of Conspiracy in the Fifth Degree; and (4) Petitioner's sentence was harsh and excessive.  (<u>See</u> Petitioner's Appellate Brief, attached as Exhibit ("Ex.") A to Declaration in Opposition to Petition for a Writ of Habeas Corpus, dated June 13, 2008 ("Resp't Decl.").)

On April 20, 2006 the Appellate Division, First Department affirmed Petitioner's judgment of conviction.  <u>See</u> <u>Collins</u>, 29 A.D.3d at 434, 815 N.Y.S.2d at 80.  The Appellate Division held that

Petitioner had "voluntarily absented himself, and thus waived his right to be present at the rendition of the verdict." Id. at 434, N.Y.S.2d at 80.   The Appellate Division further held that the evidence of uncharged crimes was "probative of Petitioner's motive and intent and provided background information explaining the sequence of events and Petitioner's increasing animosity towards the victim."   Id.   The court determined that "any prejudice was outweighed by the highly probative nature of the uncharged crimes and was alleviated by the court's suitable limiting instruction" to the jury about the purpose for which they should consider the evidence.   Id. at 434-35.   Petitioner sought leave to appeal the decision, and leave was denied.   (See Resp't Decl. Ex. G.)   This action followed.

**DISCUSSION**

## I.   AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," (28 U.S.C. § 2254(d)(1)), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).

14

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000); accord Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Ernst J. v. Stone, 452 F.3d 186, 193 (2d Cir. 2006). The phrase, "clearly established Federal law," limits the law governing a habeas Petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (quoting Williams, 529 U.S. at 412, 120 S. Ct. at 1523); accord Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard . . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law." Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 411, 120 S. Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. See Williams, 529 U.S. at 413, 120 S. Ct. at 1523. The inquiry for a

15

federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable." Id. at 408-10, 120 S. Ct. at 1521-22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently.  The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); Lurie v. Wittner, 228 F.3d 113, 128-29 (2d Cir. 2000) (same).

Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility.").  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

**II.  Right to Be Present at Material Stages of Trial**

Petitioner contends that the trial court violated his right to be present at all material stages of the trial because he was not

16

present when the jury rendered its verdict.  For the reasons set forth below, Petitioner's claim is without merit and should be rejected.

A defendant's right to be present during a criminal trial is guaranteed by the United States Constitution, and is derived from the Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due Process Clause.  "One of the most basic of the rights guaranteed by the confrontation clause is the accused's right to be present in the courtroom at every stage of his trial." Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058 (1970); see United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997) ("A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner.") (quoting Lewis v. United States, 146 U.S. 370, 372, 13 S. Ct. 136, 137 (1892)); see also Rushen v. Spain, 464 U.S. 114, 117-18, 104 S. Ct. 453, 455 (1983) (per curiam) (right to personal presence at all critical stages of the trial is a "fundamental right[] of each criminal defendant"); Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987).

This right extends not only to the confrontation of witnesses or other evidence against a defendant in a felony prosecution, but also to "all critical stages of the trial." Diaz v. United States, 223 U.S. 442, 456, 32 S.Ct. 250, 254 (1912) (quotation marks and citation omitted); see also Valdez v. United States, 244 U.S.

17

432,454, 37 S. Ct. 725, 732 (1917).  These "critical stages" include
the arraignment, the entry of any plea, the impaneling of the jury,
the return of the verdict, and the imposition of sentence.  See
Canady, 126 F.3d at 361;  Fillippon v. Albion Vein Slate Co., 250
U.S. 76, 81, 29 S.Ct. 435, 436 (1919) (explaining that the right to
be present extends "from the time the jury is impaneled until it is
discharged after rendering the verdict"); see also Shields v. United
States, 237 U.S. 583, 588-89, 47 S.Ct. 478, 479 (1927).

    Although some courts have questioned the purpose that a
defendant's presence serves during the delivery of the verdict, see,
e.g., Rice v. Wood, 77 F.3d 1138, 1140 n.2 (9th Cir. 1996), there
has long been broad acceptance of the notion that a defendant has
a fundamental right to be present at the rendition of the verdict
in his case.  See Diaz, 223 U.S. at 455, 32 S. Ct. at 254 (noting
that, "[i]n cases of felony our courts, with substantial accord,
have regarded [the right to be present] as extending to every stage
of the trial, inclusive of the empaneling of the jury and the
reception of the verdict, and as being scarcely less important to
the accused than the right of trial itself") (emphasis added); cf.
Fed. R. Crim. P. 43(a) ("defendant shall be present at . . . the
return of the verdict").[1]

    [1] New York law also requires that the verdict be rendered
and announced "in the courtroom in the presence of the court, a
prosecutor, the defendant's counsel and the defendant."  N.Y.
Crim. Proc. Law ("C.P.L.") § 310.40 (1) (McKinney 2009).  This
effectively guarantees a defendant the right to be present at

18

In <u>Larson v. Tansy</u>, 911 F.2d 392, 394 (10th Cir. 1990), for example, the Tenth Circuit held that a defendant's absence from the delivery of the jury instructions, closing arguments, and the rendition of the verdict, violated his due process rights.   The court observed that the defendant's absence "deprived [him] of his due process right to exert a psychological influence upon the jury, completely aside from any assistance he might have provided to his counsel."   <u>Id.</u> at 396.[2]   <u>See also</u> <u>Wade v. United States</u>, 441 F.2d 1046, 1049-50 (D.C. Cir. 1971) (under similar circumstances, finding violation of Fed. R. Crim. P. 43, and recognizing the role played by the defendant in exerting psychological influence over the jury). The Second Circuit has also held that a criminal defendant has a constitutional right to be present at the rendition of the verdict. <u>See</u> <u>Canady</u>, 126 F.3d at 362.   In <u>Canady</u>, the Court addressed an error that occurred in the course of a bench trial, where the court mailed its verdict to the parties.   Nevertheless, adopting the <u>Larson</u> court's reasoning, the court noted that just as a defendant's presence exerts a psychological influence upon the jury, "because the jury in deliberating towards a decision knows that it must tell

---

this stage of his trial unless he waives that right knowingly and voluntarily, or unless there are other "unique or unusual circumstances."   <u>People v. Williams</u>, 186 A.D.2d 161, 163, 587 N.Y.S.2d 704, 706 (2d Dep't. 1992).

[2] The loss of psychological influence was of particular concern to the <u>Larson</u> court because, in that case, the jury had been deadlocked, was reinstructed at some length, and was subsequently given an <u>Allen</u> charge.   <u>See</u> <u>id.</u> at 395.

the defendant directly of its decision in the solemnity of the courtroom," id., the same holds true where the fact finder is a judge.   When a jury is returning a verdict, the presence of the defendant is also useful to "correct errors such as a verdict that appears to be non-unanimous, incomplete, or inconsistent.  By being present a defendant can express his concerns to counsel before the jury is dismissed."  Id. at 361.

Therefore, the Court would be prepared to conclude that, if Petitioner was, in fact, prevented from attending the delivery of the verdict, his constitutional right to be present would have been violated.  However, in this case, the record shows Petitioner chose to absent himself when the jury delivered its verdict.  Thus, the critical question is whether the Appellate Division reasonably found Petitioner to have validly waived his right to be present.

"Although trial courts must vigorously safeguard a criminal defendant's right to be present," a defendant may nevertheless "expressly or effectively waive the right."   United States v. Fontanez, 878 F.2d 33, 36 (2d Cir. 1989); see Taylor v. United States, 414 U.S. 17, 20, 94 S.Ct. 194, 196 (1973).  As with other constitutional rights, waiver of the right to be present "must be both knowing and voluntary."  Cohen v. Senkowski, 290 F.3d 485, 491 (2d Cir. 2002) (internal quotation marks omitted).  Yet, even where a defendant makes no explicit, "on the record" statement that he gives up the right to be present, a waiver can be implied from his

20

conduct.  <u>United States v. Gagnon</u>, 470 U.S. 522, 528-29, 105 S. Ct. 1482 (1985) (finding a voluntary waiver under Fed. R. Crim. P. 43). "[T]he prevailing rule has been, that if, after the trial has begun in his presence, [a defendant] voluntarily absents himself, this . . . operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present." <u>Diaz</u>, 223 U.S. at 455, 32 S. Ct. at 254.

As a result, in many circumstances, a defendant's absence from, or refusal to participate in, some or all of the trial may operate as a knowing and voluntary waiver.  <u>See, e.g.</u>, <u>Taylor</u>, 414 U.S. at 20, 94 S. Ct. at 194 (upholding waiver of right to be present where a criminal defendant failed to return to trial and fled after a lunch recess, even without any express statement by the court that the trial would proceed in his absence); <u>United States v. Tortora</u>, 464 F.2d 1202, 1208 (2d Cir. 1972) (finding that the "deliberate absence of a defendant who knows that he stands accused in a criminal case and that the trial will begin on a day certain" constituted a knowing and voluntary waiver).  In fact, even the failure to object at the time a decision is made to proceed without the accused can constitute a waiver of the right to be present.  <u>See</u> <u>Gagnon</u>, 470 U.S. at 528, 105 S. Ct. at 1485 ("Respondents knew the [judge] was holding a conference with the juror and with [a co-defendant's] attorney, yet neither they nor their attorney made any

21

effort to attend."); <u>United States v. Rosario</u>, 111 F.3d 293, 299 (2d Cir. 1997) (finding that a defendant waived the right to be present when the judge asked him to leave the robing room while she questioned a juror and neither he nor his counsel made any objection).

Furthermore, "only minimal knowledge on part of the accused is required when waiver is implied from conduct." <u>Cohen</u>, 290 F.3d at 491 (quoting <u>United States v. Nichols</u>, 56 F.3d 403, 416-17 (2d Cir. 1995) (finding a valid waiver of the right to be present codified in Fed. R. Crim. P. 43 where the defendant knew of his right to attend trial and the ramifications of his failure to appear, but chose to remain in a holding cell); <u>see also</u> <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 247 (2d Cir. 1998) (finding that a defendant waived his right to be present during <u>in camera voir dire</u> where his attorneys attended and did not object). Consequently, a defendant may be held to have "knowingly" waived the right to be present where "the trial court's actions in open court [give a defendant] sufficient 'minimal' knowledge of the nature and purpose" of proceedings that will take place during the defendant's absence. <u>Cohen</u>, 290 F.3d at 491.

In this case, the trial court deemed Petitioner to have waived his right to be present because he indicated that he would not attend the afternoon proceedings, both before and after being advised of his right to attend by his attorney, who voiced no

22

objection to the verdict being delivered in Petitioner's absence.
Based on the record, the Appellate Division determined that
Petitioner's absence during the rendering of the verdict was knowing
and voluntary:

> [B]y refusing to attend, defendant waived
> and/or forfeited his right to be present for
> whatever proceedings would take place in his
> absence. Therefore, it was not necessary that
> defendant be made aware that the deliberating
> jury had reached a verdict. In any event, the
> record supports the inference that he was aware
> of that fact when, after conferring with
> counsel, he declined to be present.

Collins, 29 A.D.3d at 434. This decision comprises both a factual
determination that Petitioner chose to be absent from the reading
of the verdict, and a legal conclusion that his deliberate absence
constituted a knowing and valid waiver of the right to be present.
Petitioner fails to show that the Appellate Division's judgment was
unreasonable in either respect.

The record indicates that the trial court informed Petitioner,
at the outset of the trial, of his right to be present throughout
the trial. The court instructed Petitioner that "the law gives you
an absolute right to be present at the hearing and trial. The law
also states that if you fail to appear at this hearing or trial for
any, that is if you should refuse to come down from the [holding
cell] and so forth, that you would be forfeiting your right to be
present at such hearing and trial and the hearing and trial will be
conducted in your absence." (Tr. at 22-23.) The court clearly

informed Petitioner that the trial would continue in his absence.

On the morning of the day the verdict was rendered, Petitioner was present in court.  (See Tr. at 884.)  Petitioner was aware the jury was deliberating on that day because the jury left for deliberations in his presence.  (See id. at 875, 878, 883, 884, 888.)  The court planned to recess for lunch from 1:00 to 2:15. (See id. at 906.)  After lunch, Petitioner did not return to the courtroom.  (See id.)  The judge stated that he was "informed that [Petitioner] says that he is not feeling well and doesn't wish to come down to attend court."  (Id.)  The judge asked defense counsel if he would like a moment to speak with Petitioner.  (See id.) Counsel then went to speak with Petitioner in the court holding cells.  (See id.)  When he returned to court, counsel informed the court that he "advised [Petitioner] of his right to be present, and he decline[d] to attend."  (Id.)  The judge stated that he appreciated counsel's efforts and brought in the jury.  (See id.) The court informed the jury that Petitioner "exercised his right not to attend."  (Id. at 907.)  The jury then delivered its verdict in Petitioner's absence.  At no time did counsel object to continuing in Petitioner's absence.

Based on this record, the Appellate Division's factual determination that Petitioner chose to remain in his holding cell was not "unreasonable."  28 U.S.C. § 2254(d)(2).  Furthermore, the record demonstrates that the Appellate Division did not

24

"unreasonabl[y] appl[y]" the waiver doctrine in reaching its legal
conclusion that Petitioner validly waived his right to be present.
Id. § 2254(d)(1); see Taylor, 414 U.S. 19-20, 94 S. Ct. at 195-96
(rejecting the claim that a mere voluntary absence was not an
effective waiver, and holding that the defendant need not be
expressly warned of the right to be present under Fed. R. Crim. P.
43); Gagnon, 470 U.S. at 528-29, 105 S.Ct. at 1485 (observing that,
in Taylor, the court did not "require any type of waiver to exist
on the record; the defendant's failure to assert his right was an
adequate waiver," and holding that the "total failure to assert" the
right to presence waived the right under Rule 43); Cardinal v.
Gorczyk, 81 F.3d 18, 20 (2d Cir. 1996) (concluding that, because the
defendant had participated in voir dire at his first trial, he was
aware of his right to be present for the voir dire proceedings, and
his failure to assert that right at his second trial gave rise to
a waiver); Nichols, 56 F.3d at 416-17 (finding a valid waiver where
the defendant knew of his right to attend trial and the
ramifications of his failure to appear, but chose to remain in a
holding cell); United States v. Sanchez, 790 F.2d 245, 249-50 (2d
Cir. 1986)(explaining that a prisoner can waive the right to be
present by refusing to leave his cell); Morgan v. Walsh, No. 01 Civ.
1360 (DLC), 2003 WL 22019835, at *4-5 (S.D.N.Y. Aug. 27,
2003)(adopting Report and Recommendation) (finding a voluntary
waiver where a defendant declined to attend proceedings during the

reading of the verdict, because the jury had entered deliberations, and the trial judge had warned the defendant that the case would "go on," but did not specifically say that a verdict would be delivered).

Petitioner has failed to rebut the correctness of the state court's factual determination by providing "clear and convincing evidence" that he did not voluntarily choose to be absent during the return of the verdict.  See 28 U.S.C. § 2254(e)(1).  While Petitioner claims that some undefined illness prevented him from attending the delivery of the verdict, he presents no information as to how or when he became sick.  Furthermore, he was clearly not incapacitated to any degree that would have prevented him from simply walking into the courtroom, which is in the same building as the holding cells.  Indeed, his attorney informed the court that he "decline[d] to attend," not that he was unable to attend court proceedings because of illness.  (See Tr. at 906).

Petitioner claims that, regardless of whether he was ill, he was unaware that the jury had reached a verdict, and that had he known this, he would have been present.  On that basis, Petitioner claims that the Appellate Division erred in deeming him to have "knowingly" waived his right to be present.[3]  Petitioner, however,

---

[3] Petitioner's contention that, had he known the verdict would be returned, he would have been present in court, also undermines his allegation that illness prevented him from attending.

identifies no "clearly established federal law" that a knowing waiver must be based on specific knowledge of what is occurring, or going to occur, in the courtroom.[4]  See 28 U.S.C. § 2254(d)(1).  No Supreme Court holding requires that a waiver of the right to be present can only be "knowing" if the defendant is aware of exactly what will take place during his absence.  Such a requirement would lead to the cumbersome and absurd result of a trial judge having to repeatedly send counsel to apprise a voluntarily absent defendant of the events occurring in court.

To the extent that Supreme Court decisions address the degree of awareness required for a valid waiver, they support the notion that the defendant must merely have a general understanding of the type of proceeding that he will miss.  In Gagnon, the Supreme Court found it sufficient that the defendants "kn[ew a conference was] taking place between the judge and a juror in chambers."  470 U.S. at 529, 105 S. Ct. at 1486.  In the context of a waiver of the right to trial, the Supreme Court has also explained that the "law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances — even

---

[4] The Appellate Division concluded that it was reasonable to infer that Petitioner knew the jury was prepared to deliver its verdict.  Defense counsel went to speak to Petitioner because the jury had sent out a note.  Immediately after counsel reported that Petitioner declined to attend, the jury pronounced the verdict.  Neither counsel nor the court expressed any surprise about what was occurring.

though the defendant may not know the <u>specific detailed</u> consequences of invoking it." <u>United States v. Ruiz</u>, 536 U.S. 622, 629, 122 S.Ct. 2450 (2002) (emphasis in original).   This comports with the Second Circuit's development of the implicit waiver doctrine for the right to be present.   A defendant need only possess "sufficient 'minimal' knowledge of the nature and purpose" of proceedings that will take place during his absence.   <u>Cohen</u>, 290 F.3d at 491.   In this case, Petitioner's awareness certainly rose to that level, because he knew the jury had retired to deliberate.

For all of the reasons stated above, Petitioner's claim regarding the right to be present at trial should be dismissed.

## III. Ineffective Assistance of Counsel

Petitioner claims that his attorney was ineffective because he failed to object to the delivery of the verdict in Petitioner's absence.   Petitioner claims that when his attorney came to speak to him about returning to the courtroom, his attorney was unaware that the jury had reached a verdict.   Petitioner contends that, once his counsel realized that a verdict would be delivered, he should have informed the court that Petitioner was ill and asked for a brief recess.   (<u>See</u> Tr. at 906).

A federal habeas court may not consider the merits of a claim unless that claim was exhausted in the state courts — that is, the claim must have been fairly presented to the "highest state court from which a decision can be had." <u>Daye v. Attorney Gen.</u>, 696 F.2d

28

186, 190 n.3 (2d Cir. 1982) (en banc); see also Picard v. Connor, 404 U.S. 270, 92 S. Ct. 509 (1971).  Where state law affords a petitioner the right to raise a constitutional claim "by any available procedure," and the claim is not raised, it cannot be deemed exhausted.  28 U.S.C. § 2254(c).  To satisfy the exhaustion requirement, "it is not sufficient merely that the [petitioner] has been through the state courts."  Picard, 404 U.S. at 275-76, 92 S. Ct. at 512.  Rather, the claims must be fairly presented to the state courts so that the state has an opportunity to correct any alleged constitutional violations.  See Castille v. Peoples, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060 (1989); Picard, 404 U.S. at 276, 92 S. Ct. at 513; Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994); McGann v. New York, 870 F.2d 908, 910 (2d Cir. 1989); Daye, 696 F.2d at 191-92.

Petitioner's ineffective assistance of counsel claim was never raised in the New York courts.  Therefore, the claim is unexhausted.  Moreover, Petitioner cannot return to state court to exhaust his claim.  Since Petitioner's claim is record-based, he was required to raise the claim on direct appeal.  See N.Y. C.P.L. § 440.10.  He did not do so, and he has had the one direct appeal to which he is entitled.  See Spence v. Sup't, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000) ("New York permits only one application for direct review . . . ."); Jimenez v. Walker, 458 F.3d 130, 149

(2d Cir. 2006) ("[The petitioner] has already taken his one direct appeal . . . ."); <u>Roa v. Portuondo</u>, 548 F. Supp. 2d 56, 60 (S.D.N.Y. 2008) ("New York law permits criminal defendants only one direct appeal and one application for leave to appeal to the Court of Appeals."). Nor can Petitioner raise the claim in a motion brought pursuant to C.P.L. § 440, because it is record-based. Therefore, "failure to have raised the claim on direct review now forecloses further collateral review." <u>St. Helen v. Senkowski</u>, 374 F.3d 181, 183-84 (2d Cir. 2004); <u>see</u> N.Y. C.P.L. § 440.10(2)(C).

"For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" <u>Grey v. Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991) (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9 (1989)). As Petitioner has no available state forum in which to pursue a remedy, his claim may be "deemed exhausted," yet procedurally defaulted. <u>Spence</u>, 219 F.3d 162, 170 ("[H]aving failed to raise the claim on direct appeal [the petitioner] may not seek collateral relief in the New York courts. Because [the petitioner] failed to raise his claim in the ordinary appellate process and can now no longer do so, it is procedurally defaulted."); <u>Reyes v. Keane</u>, 118 F.3d 136, 139 (2d Cir. 1997) ("[The petitioner] is therefore deemed to have exhausted his state remedies for the ineffective assistance claim by his procedural default on that

issue."); <u>Roa</u>, 548 F. Supp. 2d at 60 ("[B]ecause the . . . claim was not included in [the petitioner's] direct appeal, it is in procedural default and this [c]ourt is divested of its jurisdiction to consider its merits.").[5]

As a result, this Court cannot hear Petitioner's claim unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991); <u>see also</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 149 (2d Cir. 2006); <u>Ramirez v. Attorney Gen. of New York</u>, 280 F.3d 87, 94 (2d Cir. 2001); <u>Washington v. James</u>, 996 F.2d 1442, 1447 (2d Cir. 1993). To demonstrate cause for the default Petitioner must show "that 'some objective factor external to the defense impeded [his] efforts' to raise the claim in state court."

---

[5] Petitioner's claim was therefore defaulted pursuant to independent and adequate state procedural rules. New York courts consistently adhere to the procedural bar on hearing claims that should have been raised on direct appeal via a § 440 motion. <u>See</u> <u>People v. Cooks</u>, 67 N.Y.2d 100, 103-04, 491 N.E.2d 676, 678 (N.Y. 1986) ("The purpose of those provisions is to prevent C.P.L. § 440.10 from being employed as a substitute for direct appeal when defendant was in a position to raise an issue on appeal or could readily have raised it on appeal but failed to do so.") (internal citations omitted); <u>People v. Jossiah</u>, 2 A.D.3d 877, 769 N.Y.S.2d 743 (2d Dep't 2003) (denying 440 motion where the claims "could have been raised on direct appeal"); <u>People v. Smith</u>, 269 A.D.2d 769, 770, 703 N.Y.S.2d 616, 617 (4th Dep't 2000) (same); <u>see also</u> <u>Sweet v. Bennett</u>, 353 F.3d 135, 141 (2d Cir. 2003) (observing that § 440.10(2)(C) created an "independent and adequate state ground" for barring a petitioner's claim).

31

<u>McCleskey v. Zant</u>, 499 U.S. 467, 493, 111 S. Ct. 1454, 1470 (1991)

(quoting <u>Murray v. Carrier</u>, 477 U.S. 467, 488, 106 S. Ct. 2639, 2645

(1986)); <u>accord</u> <u>Bloomer v. United States</u>, 162 F.3d 187, 191 (2d Cir.

1998).   Where a "petitioner has failed to establish 'cause,' in

other words why he did not raise these claims at the appropriate

time and in the appropriate forum, it is unnecessary to make an

inquiry into the question of 'prejudice.'" <u>Bentley v. Scully</u>, 851

F. Supp. 586, 604 (S.D.N.Y.), <u>vacated on other grounds</u>, 41 F.3d 818

(2d Cir. 1994); <u>accord</u> <u>Engle v. Isaac</u>, 456 U.S. 107, 134 n.43, 102

S. Ct. 1558, 1575 n.43 (1982); <u>Richter v. Artuz</u>, 77 F. Supp. 2d 385,

395 (S.D.N.Y. 1998) (Report and Recommendation, adopted on Nov. 18,

1999); <u>Meachem v. Keane</u>, 899 F. Supp. 1130, 1139 (S.D.N.Y. 1995)

(Report and Recommendation, adopted on Sept. 13, 1995).

A miscarriage of justice occurs "in an extraordinary case,

where a constitutional violation has probably resulted in the

conviction of one who is actually innocent." <u>Murray v. Carrier</u>, 477

U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986); <u>see also</u> <u>Bousley v.</u>

<u>United States</u>, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611 (1998);

<u>Washington</u>, 996 F. 2d at 1447.   "Actual innocence means factual

innocence, not mere legal insufficiency." <u>Dunham v. Travis</u>, 313

F.3d 724, 730 (2d Cir. 2002) (quoting <u>Bousley v. United States</u>, 523

U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998)) (internal quotation

marks omitted).   Additionally, "to be credible, such a claim

requires [a] petitioner to support his allegations of constitutional

32

error with new reliable evidence . . . ."  <u>Schlup v. Delo</u>, 513 U.S.
298, 324, 115 S. Ct. 851, 865 (1995).   The doctrine of actual
innocence applies only in "extraordinary case[s]" and "credible
claims of actual innocence are extremely rare."  <u>Doe v. Menefee</u>, 391
F.3d 147, 160-61 (2d Cir. 2004) (quoting <u>Carrier</u>, 477 U.S. at 496,
106 S. Ct. at 2639, and <u>Schlup</u>, 513 U.S. at 321, 115 S. Ct. at 864).

Petitioner fails to establish either basis for consideration
of his procedurally defaulted claim.  He has not attempted to show
cause for his procedural default; nor is there any basis for the
Court to conclude that such cause exists.  Petitioner does not
assert an ineffective assistance of appellate counsel claim, from
which the Court might infer a claim that such ineffectiveness
constituted cause for Petitioner's procedural default.  <u>Cf.</u> <u>Edwards</u>
<u>v. Carpenter</u>, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000)
(ineffective assistance of appellate counsel that independently
rises to the level of a constitutional violation may constitute
cause for procedural default).  In addition, because Petitioner has
not presented any new reliable evidence of his innocence, he has not
satisfied the miscarriage of justice standard.  Moreover, the
totality of the evidence unquestionably forecloses any claim of
actual innocence.  The prosecution presented extremely strong
evidence of Petitioner's guilt at trial, including a videotape of
him setting and stoking a fire (<u>see</u> Tr. at 638; S. at 11); testimony
from one witness whom he attempted to enlist in assaulting Cobb (<u>see</u>

33

Tr. at 409), and another to whom Petitioner confessed to setting the fire in Cobb's apartment (see id. at 147-48); Petitioner's written confession to setting the second fire (see id. at 347-48); and physical evidence such as lighter fluid, matches, and a lighter (see id. at 581-88).

Furthermore, even though Petitioner's claim is procedurally defaulted, it is apparent that it is without merit and should be dismissed for that reason as well. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Claims of ineffective assistance of counsel are evaluated under a two-part test. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001). First, a petitioner must establish that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S. Ct. at 2064. Second, a petitioner must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687, 104 S. Ct. at 2052; accord Lanfranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002); Aparicio, 269 F.3d at 95.

It is doubtful that Petitioner could establish that his

attorney acted unreasonably by not objecting to the delivery of the verdict in Petitioner's absence.  When his attorney spoke with him, Petitioner stated that he would not return to the courtroom.  <u>See</u> <u>Campbell v. Blodgett</u>, 978 F.2d 1502, 1512 (9th Cir. 1992) ("Reviewing in context the defense counsel's decision not to oppose [the defendant's] request to be absent from voir dire, we conclude that it falls well within the bounds set forth in <u>Strickland</u>."), <u>aff'd on reh'g</u>, <u>Campbell v. Wood</u>, 18 F.3d 662, 673-74 (9th Cir. 1994) (rejecting ineffective assistance of counsel claim on the basis that trial counsel "allowed [the defendant] to waive presence during the jury selection process," because the defendant himself had "decided to waive his right of presence" against counsel's advice).

Yet, even if Petitioner could make such a showing, he cannot establish that there is a "reasonable probability" that, had his attorney objected, the court would have adjourned the trial until Petitioner chose to attend.  Nor can Petitioner further demonstrate that, had the court done so, his presence during the reading of the verdict would have had an effect on the outcome of the trial.  By the time counsel informed the court that Petitioner chose not to attend, all of the evidence had been submitted, it was overwhelmingly unfavorable to Petitioner, and the jury was prepared to deliver its verdict.  In Petitioner's absence, counsel polled the jury, and there was unanimity for conviction.  (<u>See</u> Tr. at 910-11.)

35

There is thus no reasonable probability that the verdict would have been different if Petitioner had been present.

Therefore, even if Petitioner were able to satisfy the first prong of <u>Strickland</u>, he fails to meet his burden under the second prong.  <u>See</u> <u>Rolle v. West</u>, No. 05 Civ. 0591, 2008 WL 3887662, at *17-18 (E.D.N.Y. Aug. 21, 2008) (rejecting a claim that "trial counsel was ineffective because he failed to ensure that [the petitioner] was present at all material stages of his trial," because even assuming counsel waived the petitioner's right to presence without his consent, "that error did not create sufficient prejudice . . . to constitute ineffective assistance of counsel"); <u>Hennegan v. Prosper</u>, No. 04 Civ. 1900, 2008 WL 4500225, at *16 (E.D. Cal. Oct. 6, 2008) ("[E]ven assuming arguendo that petitioner's trial counsel was deficient in waiving petitioner's right to be present at the read-back of testimony to the jury, petitioner has failed to demonstrate any prejudice flowing therefrom.  The record . . . contains no indication of anything . . . that could have prejudiced petitioner in his absence.").

Because Petitioner's claim of ineffective assistance of counsel is both procedurally defaulted and without merit, it should be dismissed.

## IV. Admission of Evidence of Uncharged Crimes

Petitioner claims that the trial court erred by permitting the prosecution to introduce extensive evidence of numerous uncharged

crimes.  He asserts that the evidence had negligible probative value and served only the impermissible and highly prejudicial purpose of establishing criminal propensity.   Its admission, according to Petitioner, denied him the right to a fair trial.   Respondent concedes that this claim has been exhausted.

Because state-court rulings concerning the admission of evidence ordinarily do not present issues of constitutional magnitude, they are usually not subject to federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 480 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990)).   Therefore, a petitioner seeking habeas relief on the basis of such an error must establish that it led to the introduction of evidence "so extremely unfair that its admission violates fundamental conceptions of justice."   Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990)); see also Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'") (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988)) (emphasis in original).

Erroneously admitted evidence only reaches this level of

37

unfairness if it is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Sease v. Goord, No. 01 Civ. 1378 (HB), 2003 WL 23100261, at *6 (S.D.N.Y. Dec. 30, 2003) (quoting Dunnigan, 137 F.3d at 125); see also Sims v. Stinson, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000) (for an evidentiary error to reach constitutional magnitude, "it must have been 'crucial, critical, highly significant'") (quoting Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)), aff'd, No. 00-2479, 2001 WL 303750 (2d Cir. Mar. 28, 2001). In determining materiality, a federal habeas court reviews the erroneously admitted evidence "in light of the entire record before the jury." Collins, 755 F.2d at 19.

Under New York law, evidence of a defendant's guilt of offenses other than that with which defendant is being charged must be excluded under ordinary circumstances. See People v. Molineux, 168 N.Y. 264 (1901). This rule derives from the belief that jurors are more likely to believe in the guilt of the accused when it is known or suspected that he has previously committed a similar crime. See People v. Ventimiglia, 52 N.Y.2d 350, 359, 438 N.Y.S.2d 261, 264 (2d Dep't 1981). In order to ensure that a defendant's guilt or innocence is decided on the facts of the case rather than the defendant's propensity to commit the crime charged, evidence of uncharged crimes cannot be introduced in order to show criminal propensity. See People v. Giles, 11 N.Y.3d 495, 499, 873 N.Y.S.2d

38

244, 246 (2008).

However, under New York evidentiary rules, evidence of prior uncharged crimes or bad acts is admissible if it is relevant to issues such as intent, motive and identity. <u>See</u> <u>id.</u> at 499, 873 N.Y.S.2d at 246. Evidence may also be introduced if it is necessary to complete the narrative of events involved in a crime, or is relevant to a witness's or victim's credibility. <u>See</u> <u>People v. Wilson</u>, 279 A.D.2d 381, 382, 719 N.Y.S.2d 555 (1st Dep't 2001). Specifically, evidence of uncharged crimes may be relevant to show "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." <u>Molineaux</u>, 168 N.Y. at 264. Furthermore, "[u]nder certain circumstances, when coupled with proper limiting instructions, testimony of this kind may fill in the gaps in 'interwoven events' and thus help the jury understand the case in context." <u>People v. Resek</u>, 3 N.Y.3d 385, 390, 787 N.Y.S.2d 683 (1st Dep't 2004).

In this case, the trial court's evidentiary ruling violated neither state law nor federal constitutional law. The court admitted the evidence of the uncharged crimes upon determining that the evidence was necessary to form the <u>res</u> <u>gestae</u>, meaning "the events at issue, or other events contemporaneous with them," Black's

39

Law Dictionary (8th ed. 2004), of the crimes Petitioner was charged with committing. (<u>See</u> Trial Tr. vol 1, dated Jan. 7, 2003, at 26.) <u>See</u> <u>United States v. Coonan</u>, 938 F.2d 1553, 1561 (2d Cir. 1991) ("Background evidence may be admitted to show . . . the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

The Appellate Division held that the court's "ruling was an appropriate exercise of discretion as the evidence of uncharged crimes . . . provided background information explaining the sequence of events and defendant's increasing animosity toward the victim." <u>Collins</u>, 29 A.D.3d at 434. Moreover, the Appellate Division found that "any prejudice was outweighed by the highly probative nature of the uncharged crimes and was alleviated by the court's suitable limiting instruction." <u>Id.</u> at 435. Petitioner disputes these findings, arguing that the evidence in question pertained to discrete acts, taking place at different locations on different dates. He further claims that the prejudicial nature of the evidence outweighed the probative value.

This argument is baseless. The introduction of evidence of the prior fires he set, and the false allegations he made against Cobb, served as evidence of his intent and identity, as well as necessary information to complete the narrative of events and provide a theory as to why Petitioner took particular actions. Specifically, the

40

evidence supported the state's claim that Petitioner was in part
motivated to set the fires in an effort to frame Cobb.  It was thus
logically linked to a specific material issue in the case.   In
addition, the trial court instructed the jury to consider the
evidence solely for the limited purposes of completing the sequence
of events leading to Petitioner's arrest, and thereby of determining
whether he had motive and intent to commit the crime.  (See Resp't
Decl. Ex. B at 48.)[6]  For these reasons, the trial court's ruling
was proper under state law.

Nor did admission of the evidence in any way impair
Petitioner's right to a fair trial.  In light of the "entire
record," Collins, 755 F.2d at 19, which contained other extremely
strong evidence of Petitioner's guilt, the evidence was not so
"crucial" or "critical" to conviction, Sims, 101 F. Supp. 2d at 194,
such that its exclusion would have created reasonable doubt.
Furthermore, because "the trial court's limiting instructions to the
jury cured any potential prejudice," and assured that the evidence
would be considered only to complete the narrative of Petitioner's
course of conduct, the court's ruling was not "so extremely unfair
[as to] violate fundamental conceptions of justice."   Dawson v.
Phillips, No. 03 Civ. 8632 (RMB)(THK), 2008 WL 818539, at *13-14

---

[6] The trial court did, however, determine that evidence of
Petitioner's prior relations, including evidence that Petitioner
set fire to an ex-boyfriend's bed (see Resp't Decl. Ex. B at 39),
was not admissible due to its highly prejudicial nature.

(S.D.N.Y. Mar. 25, 2008) (quoting <u>Dunnigan</u>, 137 F.3d at 125) (adopting Report and Recommendation).  Admission of the uncharged crimes evidence thus provides no basis for a constitutional claim.

For each of these reasons, Petitioner's claim should be dismissed.

## V. Excessive Punishment

Petitioner claims that the sentence he received, an aggregate prison term of twenty-five and one-third to twenty-eight years, is unduly harsh and severe and violates the principle of proportionality.  Petitioner presents evidence of mitigating circumstances and plea offers made by the state to support his claim.  Petitioner claims that his sentencing was influenced by his refusal to plead guilty and that the court erroneously imposed the same sentence for the two separate and distinguishable arson convictions.  The Appellate Division concluded that there was no basis to reduce the sentence.  <u>See</u> <u>Collins</u>, 29 A.D.3d at 434.

A sentencing claim is not cognizable in a federal habeas proceeding if it does not present a federal constitutional question. In the vast majority of circumstances, there is no federal constitutional question if the sentence imposed by a state court falls within the range prescribed by state law.  <u>See</u> <u>Dorsey v. Irvin</u>, 56 F.3d 425, 427 (2d Cir. 1995); <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) ("[N]o federal constitutional issue is presented where . . . the sentence is within the range prescribed

42

by state law."); accord Edwards v. Marshall, 589 F. Supp. 2d. 276 (S.D.N.Y. 2008); Martinez v. Cunningham, No. 04 Civ.3905 (PAC)(FM), 2006 WL 3019577, at *2  (S.D.N.Y., Oct. 23, 2006); Mercer v. Keane, No. 95 Civ. 1538 (JFK), 1997 WL 529031, at *5 (S.D.N.Y. Aug. 25, 1997); Thomas v. Senkowksi, 968 F. Supp. 953, 956 (S.D.N.Y. 1997); Alvarez v. Scully, No. 91 Civ. 6651 (PKL), 1993 WL 15455, at *12 (S.D.N.Y. Jan. 11, 1993), aff'd, 23 F.3d 397 (2d Cir. 1994); Underwood v. Kelly, 692 F. Supp. 146, 152 (E.D.N.Y. 1988), aff'd, 875 F.2d 857 (2d Cir. 1989).

Petitioner's sentence was within the authorized statutory range and below the maximum permissible sentence.  Petitioner faced determinate sentences of between five and 25 years for each of the arson and burglary convictions.  See N.Y. Penal Law §§ 70.02(1)(a), (3)(a); 140.30; 150.15.  Moreover, given Petitioner's convictions of three violent felony offenses in this case, by operation of law he faced a maximum determinate sentence of fifty years in prison. See id. § 70.30(1)(e)(vii)(A).  The Court instead imposed an aggregate sentence of from twenty-six and two-thirds to thirty-two years' imprisonment, a little more than half of the term of the statutory maximum it could have imposed.

Petitioner concedes that his overall sentence was permissible under state law.  Yet, he complains that his sentences for the two arson convictions should not have been identical, because setting the fire in Cobb's apartment was a much more serious offense than

43

burning his own doormat.  This argument is misplaced.  Consistency between sentences for acts of different severity is not a constitutional violation.  As the Court has already explained, the state amply carried its burden of proving Petitioner's guilt on both charges.  That the second fire fortunately did not do more damage, does not expose Petitioner's conviction to a backdoor attack on the sufficiency of the evidence based on comparing his sentence to that received in connection with the first fire.  Because the Constitution "does not require strict proportionality between crime and sentence," the trial judge was free to sentence Petitioner within the statutory range, as he saw fit, for each conviction. Haremlin v. Michigan, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705 (1991).

Furthermore, for purposes of habeas review, the only constitutional limit on sentences that comply with state statutes is the "gross disproportionality principle, the precise contours of which are unclear, [and which is] applicable only in the 'exceedingly rare' and 'extreme' case."  Lockyer v. Andrade, 538 U.S. 63, 73, 123 S. Ct. 1166, 1173 (2003).  In assessing claims of gross disproportionality, courts may weigh the gravity of the offense and the harshness of the penalty, as well as compare the sentence to others imposed for the same crime.  See Solem v. Helm, 463 U.S. 277, at 290-91, 103 S. Ct. 3001 (1983); Gonzalez v. Duncan, 551 F.3d 875, 887-90 (9th Cir. 2008) (assessing the severity of a

habeas petitioner's sentence, and making interjurisdictional and intrajurisdictional comparisons to sentences for similar crimes). Examples of "extreme cases" in which courts have judged the punishment for a crime to be so outrageously excessive as to violate the Eighth Amendment include a sentence of life in prison without possibility of parole for the offense of uttering a "no account" check for \$100, see Helm, 463 U.S. at 281-82, 103 S. Ct. 3001, a sentence of twenty-five years to life for shoplifting, see Ramirez v. Castro, 365 F.3d 755, 775 (9th Cir. 2004), and a sentence of twenty-eight years to life for the "passive, harmless, and technical" violation of failing to comply with a law requiring updated registration as a sex offender, Gonzalez, 551 F.3d at 886, 889.

There is nothing approaching this level of disparity between Petitioner's sentence and his crimes. Arson is a violent felony, and Petitioner's sentences of twelve years in prison for each conviction — which account for the bulk of his total sentence of thirty years — fall well within the range customarily imposed in New York. See, e.g., People v. Ruiz, 291 A.D.2d 418, 418, 738 N.Y.S.2d 59, 59 (2d Dep't 2002) (noting sentence for conviction of second degree arson of twelve and one-half to twenty-five years); People v. Dickson, 55 A.D.3d 1137, 1137 867 N.Y.S.2d 216, 217 (3d Dep't 2008) (upholding the defendant's sentence of ten years in prison for arson in the second degree); People v. Kirkwood, 165 A.D.2d 881, 56

45

N.Y.S.2d 354 (2d Dep't 1990) (noting that the defendant received a sentence of from eight and one-half to twenty-five years for a second degree arson conviction).

There can thus be no plausible suggestion that the Appellate Division unreasonably applied the gross disproportionality principle in rejecting Petitioner's claim that his sentence should be reduced. See Davis v. Goord, No. 02 Civ. 9034 (KMW)(JCF), 2004 WL 880392, at *4 (S.D.N.Y. Apr. 23, 2004) ("[The petitioner's] sentence of five to fifteen years [for attempted arson] was well within the guidelines established by New York law. . . . Furthermore, the [petitioner] failed to demonstrate that the sentence imposed was disproportionate to his offense . . . ."). The claim therefore provides no basis for habeas relief, and it should be dismissed.

CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the Petition be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir.), cert. denied, 531 U.S. 873, 121 S. Ct. 175 (2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 82 S. Ct.

46

917 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6(a) and (d).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Barbara S. Jones, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Jones.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 145, 106 S. Ct. 466, 470 (1985); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: May 11, 2009
       New York, New York

Copies mailed to:

Mark Collins
03-A-952
Clinton Correctional Facility
Box 2000
Cook Street
Dannemora, N.Y. 12929

47

Leilani Rodriguez, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271